TARA K. MCGRATH
United States Attorney
VALERIE H. CHU
California Bar No. 241709
Assistant U.S. Attorney
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone:(619) 546-6750

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | Case No.  20CR1566-DMS |
|---|---|---|
|  | ) |  |
|  | ) |  |
| v. | ) | **UNITED STATES'** |
|  | ) | **SENTENCING MEMORANDUM** |
| MELINDA GREEN, | ) |  |
| CHARLES RONALD GREEN, JR., | ) | Date: March 1, 2024 |
|  | ) | Time: 9:00 a.m. |
| Defendants. | ) |  |
|  | ) |  |

# I

# INTRODUCTION

Defendants Melinda and Charles Ronald "Ron" Green (together, the Greens) admitted to having engaged in not one multi-million dollar heath care fraud scheme, but two. They targeted not just one federal health care benefit program, but two: TRICARE and Medicare. When TRICARE dollars for custom compounded pharmaceuticals dried up, the Greens shifted to Medicare dollars for Durable Medical Equipment ("DME"), billing tens of millions of dollars to each taxpayer-funded program.

On the other hand, the Greens do present some equities, including significant health concerns for Melinda. And, notably, ever since their guilty pleas the Greens have offered to cooperate with law enforcement in the investigation and prosecution of others. Nonetheless, to account for the full breadth and depth of the crimes as well as defendants' history and circumstances, and to avoid unwarranted sentencing disparities, the United

States submits that custodial sentences of 41 months for Ron Green and 27 months for Melinda Green are appropriate.

## II

## STATEMENT OF FACTS

**A. THE SCHEMES TO DEFRAUD**

The Greens participated in, diffused accountability for, and profited from, their scheme by using multiple entities that they owned or for which they were officers. These included:

a. NHS PHARMA, INC. (NHS) – Melinda GREEN was the Chief Executive Officer (CEO). Charles Ronald GREEN became the CEO and Director.

b. NHS PHARMA SALES, INC. (NHS PHARMA) – Melinda GREEN was a Director. Charles Ronald GREEN was the CEO.

c. FOCUS DME BILLING INC. (FOCUS) -- Melinda GREEN was a Director/Officer. Charles Ronald GREEN was the CEO and a Director.

d. FOCUS DME MANAGEMENT INC. (FOCUS MGMT) – Melinda GREEN was a Director/Officer. Charles Ronald GREEN was the CEO and a Director.

e. PRV MEDICAL SUPPLY INC. (PRV) – Melinda GREEN was the CEO. PRV applied to become a supplier of DME to Medicare patients, and its ownership changed to Melinda GREEN, on September 1, 2018.

f. EZ LIFE MEDICAL SUPPLY, INC. (EZ LIFE) – Charles Ronald GREEN was the CEO and Director. EZ LIFE applied to become a supplier of DME to Medicare patients, and its ownership changed to Charles Ronald GREEN, on June 1, 2018.

g. ZEE & ASSOCIATES INC. (ZEE) – Charles Ronald GREEN was the Agent for Process. ZEE applied to become a supplier of DME to Medicare patients, and its ownership changed on June 15, 2019 to Charles Ronald GREEN.

h. CHOICE MEDICAL PRODUCTS, INC. (CHOICE) - Charles Ronald GREEN was the CEO and President. CHOICE applied to become a supplier of DME to Medicare patients.

The Greens partnered with a number of other businesses, including Brookhaven Specialty Pharmacy, LLC. ("Brookhaven"), a compounding pharmacy located in the Northern District of Oklahoma; SKR Services and Ventures LLC ("SKR"), a Florida company that purportedly marketed compounded medications dispensed by Brookhaven and other compounding pharmacies, Red Rock Operations, LLC ("Red Rock"), a warehousing and packaging company located in the Northern District of Georgia, and Square One, LLC ("Square One"), an insurance eligibility screening company located in the Northern District of Georgia.

**TRICARE compounded medication fraud scheme**

The Greens got their start with a TRICARE fraud scheme. Beginning on or about May 12, 2014 and continuing through at least on or about June 29, 2015, within the Southern District of California, and elsewhere, the Greens conspired to execute a scheme to defraud involving the submission of false and fraudulent claims to TRICARE for expensive and medically unnecessary pain creams, scar creams and multi-vitamins (collectively, "compounded medications"), which were billed through Brookhaven and other pharmacies.

In furtherance of the conspiracy, Defendants and others caused compounding pharmacies, including Brookhaven, to make false and fraudulent claims to TRICARE and other payers for medically unnecessary compounded medications that were dispensed pursuant to false and fraudulent prescriptions obtained through a system of illegal health care kickbacks.

Brookhaven and other compounding pharmacies paid the Greens' various companies millions of dollars in illegal kickbacks and other remuneration in exchange for the referral of the false and fraudulent prescriptions for compounded medications to TRICARE beneficiaries. Specifically, Brookhaven and other pharmacies paid companies controlled by the Greens approximately 55% of the amount they were paid by health care benefit plans, including TRICARE, for each prescription the Greens had sent to the pharmacies to be filled. The Greens and others in turn paid a portion of this sum as a kickback to SKR

and other so-called "marketing" organizations, in exchange for, and as a further inducement to those organizations to, refer prescriptions for compounded medications to the designated pharmacies for beneficiaries of health care benefit programs including TRICARE. TRICARE and other payers often reimbursed compounding pharmacies including Brookhaven thousands of dollars for a 30-day supply of a compounded pain or scar cream for one beneficiary.

In furtherance of the compounding fraud scheme, the Greens and others developed compounded medication formulations for the primary purpose of inflating the amount of money TRICARE would reimburse to Brookhaven, and to correspondingly increase the amount of kickbacks and remuneration that NHS and its affiliated marketers would receive. The Greens and others executed the compounding fraud scheme, for example, by using billing data to run "test claims" designed to identify high paying components which the Greens and others in turn assembled into expensive compounded medication formulations paid for by TRICARE and other health care benefit plans. Once identified and assembled, the Greens dispensed the prescription pads to marketing organizations including SKR that subsequently caused telemedicine physicians to ratify them irrespective of medical necessity.

It was a material misrepresentation to TRICARE as to the validity of the claims when the pharmacies submitted claims to TRICARE for compounded medications that were engineered for maximum reimbursement and not based on medical necessity.

The Greens' knowing participation in the compounding fraud scheme resulted in the submission of false and fraudulent claims by Brookhaven in the approximate sum of $8,107,816, of which TRICARE paid Brookhaven at least the approximate sum of $6,776,222.

**Medicare DME Fraud Scheme**

As a continued part of their conspiracy, between no later than June 1, 2018 and up to at least April 2019, the Greens conspired to execute a scheme to defraud Medicare through

the submission of false and fraudulent claims for expensive DME which were induced through a system of illegal kickbacks.

In furtherance of the DME fraud scheme, the Greens caused DME companies under their ownership or control (EZ LIFE, PRV, ZEE, and CHOICE) to make false and fraudulent claims to Medicare. The Greens and others executed the DME fraud scheme by purchasing "completed doctors' orders" ("D.O.'s") from various "marketers" for Medicare beneficiaries, which included a prescription signed by a doctor certifying that the beneficiary received an exam that met Medicare's requirements and that the DME was medically necessary.

The submission of claims based on the purchased D.O.'s constitutes a material misrepresentation to Medicare that the claim complied with all Medicare regulations, including that the DME provider had not violated the Anti-Kickback Statute.

In an attempt to disguise the DME fraud scheme from detection, the Greens and their co-conspirators entered into sham "marketing" and other contracts that concealed the pay-per-order arrangement.

In addition to purchasing D.O.s in furtherance of making false and fraudulent claims on behalf of DME companies they owned or controlled, the Greens in some instances brokered D.O.s by re-selling them at a markup to other DME companies, through their other companies (NHS and NHS SALES).

Over the course of the DME fraud scheme, the Greens, through their various entities, submitted false and fraudulent claims to Medicare as follows:

a. from September 4, 2018 through April 4, 2019 (when it was placed on payment suspension), PRV submitted claims to Medicare totaling $40,560,360.43 for DME and was paid by Medicare $21,147,325.85;

b. from June 1, 2018 through April 9, 2019, E.Z. LIFE submitted claims to Medicare totaling $84,323,467.09 for DME and was paid by Medicare $47,717,790.16;

c. from June 15, 2019 through June 29, 2020, CHOICE submitted claims to Medicare for orthotics totaling $496,843.09 and was paid by Medicare $272,920.66; and

d. from June 15, 2019 through June 29, 2020, ZEE submitted claims to Medicare for orthotics totaling $1,552,105.62 and was paid by Medicare $777,873.02.

**Claims and Overt Acts**

The Greens committed the following overt acts in furtherance of their conspiracy to defraud TRICARE and Medicare:

a. On or about May 8, 2015, in the Southern District of California, the Greens and others caused the submission of a false and fraudulent claim to TRICARE in the approximate sum of $14,178 for Baclofen Powder.

b. On or about November 15, 2018, the Greens and others caused PRV Medical to submit a medically unnecessary claim to Medicare in the amount of $2,005.08, for a back brace, and a right-side shoulder-elbow-wrist-hand orthosis for Medicare patient M.G.

c. On or about January 18, 2019, the Greens and others caused E.Z. Life to submit a medically unnecessary claim to Medicare in the amount of $3,703.10, for a back brace, left and right knee braces, and left and right suspension sleeves for Medicare patient D.B.

d. On or about February 4, 2019, Melinda GREEN emailed two coconspirators the prices she charged for D.O.'s for various types of DME products.

e. On or about March 14, 2019, Charles Ronald GREEN prepared and submitted an invoice from NHS Pharma that concealed that NHS Pharma was being paid a per-brace kickback for selling D.O.'s, but claimed instead to be charging for a "TV Campaign," at a price of $35,000, a quantity of 716 for "Landing Pages," and $6,928.71 for processing hours.

**B. PENDING CHARGES**

On June 10, 2020, a seven-count Indictment was returned in the Southern District of California against the Greens, alleging that the Greens conspired with SKR, Senthil Ramamurthy, Anthony Mauzy, Jennifer John Carbon, Mangala Ramamurthy, Asif Uddin, and various corporate entities (all previously charged elsewhere), to engage in the TRICARE compounded medication scheme.  That Indictment included forfeiture allegations against a real property in Escondido, California.   Dkt. No. 1.

On September 10, 2021, a two-count superseding Information was filed against the Greens, alleging a conspiracy to defraud health care benefit programs in violation of 18 USC 371, alleging the TRICARE and Medicare schemes, and alleging a single-count of health care fraud in violation of 18 USC 1347. That Information included forfeiture allegations against the Escondido property named in the TRICARE indictment and another real property in Windermere, Florida, as well as multiple bank accounts. Dkt. No. 67.

## III

## SENTENCING RECOMMENDATION

### A. GUIDELINES CALCULATIONS

The United States recommends the following Guidelines calculations:

1. Base Offense Level [§2B1.1] .................................................................................6
2. Actual Loss More than $65 mill [§2B1.1(b)(1)(M)] ............................. +24
3. Loss to Govt Health Care Program More than $20 mill [2B1.1(b)(7)] . +4
4. Acceptance of Responsibility [3E1.1] ...................................................... -3
5. Package Disposition / Cooperation [§5K1.1] ........................................... -2
6. Zero Point Offender [§4C1.1] .................................................................. -2
7. Total offense level .................................................................................27

At Offense Level 27 and criminal history category I, the Guidelines range for each defendant is 70-87 months. As set forth in the Appendix, the United States recommends an additional 5-levels off pursuant to USSG §5K1.1.

### B. OBJECTIONS TO THE PSR

The United States Probation Officer recommends custodial sentences totaling **72 months** for Melinda Green and **96 months** for Charles Ronald Green.

Both Defendants object to their respective PSRs for failing to grant departures under Zero Point Offender. As set forth in the plea agreement, the United States does not recommend a role adjustment for either Defendant, and thus agrees that the Zero Point Offender provision is applicable.

The Probation Officer recommended a four-level departure pursuant to USSG §5K1.4, physical condition, for Melinda Green. M. Green PSR, p. 18 ¶ 96. The United States defers to the Court on whether to adopt this recommendation. If applied, a four-level departure would produce an adjusted offense level of 23, with a sentencing range of 46-57 months. No similar departure was recommended for Charles Ronald Green, and the United States concurs; Melinda Green appears to have adult siblings and adult children and is a member of a faith community, and thus, while undoubtedly helpful, Charles Ronald Green is not the "irreplaceable caretaker" that would justify a Guidelines departure. In addition, the individual he cares for is his criminal co-defendant. It would not appear to be consistent with the intent of the departure – to "protect … family members from the impacts of [a] defendant's prolonged incarceration" – for this to justify departures for two defendants who *each* face periods of prolonged incarceration.[1]

In their objections, Defendants provide various updates regarding coconspirators' sentences and raise grounds for additional departures. The United States submits that the circumstances raised by Defendants do not fall outside the "heartland" of cases for purposes of justifying Guidelines departures, but that the Court can take them into account in applying the §3553(a) factors.

---

[1] *See United States v. Leon*, 341 F.3d 928, 931 (9th Cir. 2003) ("Permissible downward departures generally involve situations where the defendant is an *irreplaceable* caretaker of children, elderly, and/or seriously ill family members, and the extent of the departure appropriately serves to protect those family members from the impacts of the defendant's prolonged incarceration."); *United States v. Sweeting*, 213 F.3d 95, 98-102 (3d Cir. 2000) (vacating downward departure where defendant was a single parent of a child with Tourette's Syndrome, because the record–that defendant helped her son with his treatment of diet and exercise–did not show defendant was "so irreplaceable" as to make circumstances extraordinary); *United States v. King*, 280 F.3d 886, 888-89 (8th Cir. 2002) (reversing downward departure because although defendant's wife had advanced arthritis, her parents lived next door, and there was no showing she could not care for their children), cert. denied, 537 U.S. 965 (2002); *United States v. Young*, 105 F.App'x 926, 927 (9th Cir. 2004) (vacating downward departure because defendant's family circumstances–a mother in poor health and three siblings an hour away–were not extraordinary because he was not an "irreplaceable caretaker for his mother").

## C. ADDITIONAL SENTENCING FACTORS UNDER § 3553(a)

After calculating the applicable Guidelines, the United States turns to the sentencing factors. The United States believes that its recommended sentences satisfy the §3553(a) factors.

### 1. Nature and Circumstances of the Offense, and the History and Characteristics of the Defendant [18 USC §3553(a)(1)]

The Greens committed an extensive and expensive fraud on two federal health care benefit programs, tailoring their efforts to exploit the vulnerabilities of each program.

For a time TRICARE reimbursed at absurdly high levels for "custom" pharmaceuticals, calculating its repayments based on the cost of the components since there was no comparable retail or off-the-shelf price. The Greens and their coconspirators (and many others, it should be noted), concocted the most expensive compounds possible, by combining the highest-cost ingredients and then executing "test-claims" to ensure that TRICARE would pay for those. Once developed, the Greens through their companies paid "marketers" to disburse these prescription pads to doctor and doctor groups. Brookhaven got those prescriptions, and when it dispensed the compound and billed to TRICARE, it paid a significant kickback to the Greens.

In 2015 the exploding costs of custom pharmaceuticals for military servicemembers prompted TRICARE to adjust its calculation of reimbursement rates and its coverage for custom pharmaceuticals, which effectively ended the money grab – but not before fraudsters nationwide billed TRICARE out of *billions* of dollars for fraudulent compound medications.[2]

---

[2] *See* "It was the Biggest Scam in Tricare's History. Now Troops May be Going to Jail," Military News, September 30, 2019, available at https://www.military.com/daily-news/2019/09/30/it-was-biggest-scam-tricares-history-now-troops-may-be-going-jail.html ("When the Defense Health Agency's losses caused by these specious prescriptions topped nearly $1.5 billion in the first half of 2015, the Pentagon moved to restrict its coverage of all compounded medications. … And the Justice Department began pursuing the unscrupulous pharmacists, doctors, marketers and salesmen involved, including military troops who saw the largest case of medical fraud in the Pentagon's

Apparently undeterred, the Greens proceeded on to the next scheme *du jour*: billing Medicare for DME procured through payments to sham telemedicine doctors and call centers that pushed and pressured elderly Medicare beneficiaries across the country to take back braces, knee braces, wrist braces and shoulder braces that their doctors had never prescribed. With networks in place, the Greens easily adapted their system to exploit this new money-making opportunity, and figured out ways to profit in multiple ways: by selling D.O.s, offering billing services, and by billing Medicare through their own DME companies. Through their various DME companies, they submitted claims to Medicare totaling over *$126 million dollars*, and were actually paid by Medicare approximately $69,915,909. As they grew their business to chase after new fraud opportunities, along the way they recruited and involved multiple family members, including Brett Sabado (Melinda's son), and Ronald Green, Jr. (Ron's son), each of which has been charged and convicted for their own roles in the Greens' scheme.

 As to their history and characteristics, like many white collar defendants, the Greens present with certain equities. In addition to claims about Melinda Green's health, they will undoubtedly submit many letters from well-wishers and supporters, citing their good works and contributions to the community. Warm letters from friends, family, and colleagues may be honest and heartfelt. But they are not atypical in white-collar cases. "[E]xcellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her." *United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003). Courts should "view such evidence with the skepticism of experience in sentencing executives who commit white-collar offenses." *Id. See also*, *e.g.*, *United States v. Della Rose*, 435 F.3d 735, 738 (7th Cir. 2006) (supportive letters "by no means out of the ordinary" because privileged white-collar offenders "often have

---

history as a chance to make cash on the side…As of May 2019, the Justice Department has indicted and sentenced 74 people, with 50 more convicted and awaiting sentencing in the nationwide scheme perpetrated by at least 100 pharmacies.").

impressive records of civic and philanthropic achievement"); *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) ("record of good works is neither exceptional nor out of the ordinary for someone of his income and preeminence"); *United States v. Kohlbach*, 38 F.3d 832, 837-39 (6th Cir. 1994) (not unusual for white-collar offender to have been leader in community charities, civic organizations, church efforts, and have performed prior good works).

While it is commendable that the Greens have accomplished positive things, ultimately it should be noted that one can be generous to charities when one has procured *millions of dollars* of fraudulent proceeds.

### 2. Need for sentence imposed to reflect seriousness of the offense, promote respect for law, provide just punishment, afford adequate deterrence, and protect public [18 USC §3553(a)(2)]

There is no question that the conduct underlying this case was serious. However, the Greens may contend that there is no need for a sentence of imprisonment because they have been adequately punished through of the loss of their businesses and home, the harm to their reputation, and the detriment to their future earning potential as convicted felons. But collateral harm of this kind is hardly unusual in the white-collar setting, and section 3553(a)(2) specifically directs courts to consider "the need for the *sentence* imposed" to meet a number of goals. Financial, reputational, and professional harm are not part of a defendant's sentence. Nor are they consequences specifically of the sentence. Based on this analysis, federal courts have concluded that it would be improper to rely upon these sorts of collateral consequences to satisfy the sentencing goals laid out in § 3553(a)(2). *See United States v. Tamarin*, 851 Fed. Appx. 726, 729 (9th Cir. 2021) (affirming a "high-end Guidelines sentence" of a doctor involved in Medicare fraud by holding that the likely loss of his medical license "and resulting financial ruin" were the natural consequences of his crime and did not permit a downward departure)*; United States v. Morgan*, 635 Fed. App'x 423, 445-46 (10th Cir. 2015) (holding that consideration of white-collar collateral consequences "impermissibly favor[s] criminals . . . with privileged backgrounds"). As the First Circuit has cautioned, "[I]t is impermissible for a court to impose a lighter

11

sentence on white-collar defendants than blue-collar defendants because it reasons white-collar defendants suffer greater reputational harm or have more to lose by conviction." *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012)). Echoing this concern, the Sixth Circuit in *United States v. Peppel*, 707 F.3d 627, 636 (6th Cir. 2013), overturned a light sentence motivated by collateral consequences (in particular, reputational harm) on the ground that "humiliation before his community, neighbors, and friends—would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines."

In addition, the Defendants' sentences should reflect the seriousness of the offense and effect general deterrence. In white collar fraud cases such as this, the need for general deterrence is paramount. "White collar crime . . . usually requires a well-schooled, intelligent criminal . . . ." *United States v. Edwards*, 595 F.3d 1004, 1021 (9th Cir. 2009) (Bea, J., dissenting). Because these are intelligent criminals, they can rationally assess the potential downsides of their actions. Writing in dissent, Judge Bea starkly described the danger of a sentence that fails to adequately set an example for others, explaining:

> … fraud, unlike an assault in a tavern or even domestic abuse, tends to be a planned, deliberate crime, which allows plenty of time for reflection, calculation of the odds of success or failure, and the ultimate decision. . . . It is precisely at this point when the thief of above-average education and wit is deciding whether to do the deed that reflection on probable prison time -- general deterrence -- can have an effect. Like the taxpayer who decides not to defraud the fisc for fear of wearing an orange jumpsuit for a long time because he knows that the government goes after everyone -- even Al Capone -- for tax fraud, the contemplating bank fraud thief should be forced to consider a message other than: "Oh, if you get caught and you put on a repentant's suit, you'll probably get probation and a restitution order of 20% of what you stole. And about that restitution order, don't worry too much because, in America, there are no debtor's prisons. So if you don't pay, you won't do time."

*Id.*

Crimes like this drain government programs of precious funds, undermine support for social safety nets, and increase the costs of health care for all Americans. As the Inspector General of the Department of Defense explained:

> Fraud is a leading contributor to increasing health care costs. Health care services are susceptible to fraud partly because of how claims are paid across the health care industry. While some pre-payment reviews exist for high-risk payments in the health care industry, insurance companies, including TRICARE, pay for most services without reviewing the medical records to determine whether the bills are accurate and supported by documentation. According to the [Defense Health Agency], it does not have the resources to review supporting documentation for all claims because of the high volume of health care claims received daily. As a result, health care claims are more vulnerable to fraudulent activity. Health care fraud schemes constantly evolve, which makes combating fraud a continual challenge.[3]

Because health care claims are especially vulnerable to fraud, there is a heightened need for general deterrence. *See also United States v. Edwards*, 2010 U.S. App. LEXIS 19489 (9th Cir. Sept. 20, 2010) (Gould, J., dissenting from denial of rehearing en banc) ("It doesn't take a crystal ball to see that those occasional dishonest persons in the business community may make a slide-rule calculation that they can steal hundreds of thousands of dollars, maybe even millions, because if caught they see a good chance that they can walk away with expressed contrition and probation. That is the result the Sentencing Guidelines have long worked to prevent.") *See also United States v. Hayes*, 62 F.3d 1300, 1308 (11th Cir. 2012) ("general deterrence is an important factor in white-collar cases, where the motivation is greed"); U.S.S.G. Ch. 1 Pt. A(4)(d) ("[T]he definite prospect of prison [for economic crime], even though the term may be short, will serve as a significant deterrent, particularly when compared with pre-guidelines practice where probation, not prison, was the norm.").

---

[3] "Special Report: Controls Implemented by the Defense Health Agency to Control Costs for TRICARE Coronavirus Disease-2019 Pandemic Related Services," Department of Defense, Office of the Inspector General, (September 2020) available at https://www.dodig.mil/reports.html/Article/2338326/special-report-controls-implemented-by-the-defense-health-agency-to-control-cos/

Here, the recommended sentences recognize the need for deterrence, but also reward the decision to plead guilty and cooperate with law enforcement.

**3. Avoiding unwarranted sentencing disparities [18 USC § 3553(a)(6)]**

The sentence imposed must also avoid unwarranted disparities among individuals guilty of similar conduct. Hundreds of individuals have now been sentenced across the nation for their own roles in similar multi-million-dollar scams against TRICARE and Medicare. Perhaps most relevant here are the Greens' own coconspirators who have already been sentenced. Notably, these coconspirators were charged and convicted only of the TRICARE scheme, and yet their sentences and financial penalties were hugely significant. Even after Rule 35 motions, Senthil Ramamurthy was sentenced to 60 months; Mangala Ramamurthy to 22 months, Anthony Mauzy to 29 months, Jennifer John Carbon 12 months, and Asif Uddin was sentenced to 5 years' probation.

It should be noted that Brett Sabado, Melinda Green's son, was prosecuted in the Northern District of Georgia for his involvement in the TRICARE and Medicare schemes. Sabado admitted to operating "NHS, a pharmaceutical company that caused compounding pharmacies to submit false claims for these prescriptions to Tricare," and "also conspired with the owners of DME supply companies to submit false and fraudulent claims for medically unnecessary DME such as arm, leg, back, wrist, and neck braces to Medicare."[4] He was sentenced to 60 months in custody and 3 years of Supervised Release. Ronnie Green, Charles Ronald Green's son, admitted to participating only in the TRICARE scheme, for a brief period between January and June 2015, and was sentenced to 5 years' probation. *See* Crim. Case. No. 21CR1275-DMS.

Recently, in this district, in Criminal Case No. 18CR0432-JLS, two former U.S. Marines were sentenced to 21 months and 15 months for their roles in a $65 million TRICARE compound medication scheme. They had recruited fellow Marines to sign up to receive compound drugs. In addition to the useless drugs, the Marines got a monthly

---

[4] https://www.justice.gov/usao-ndga/pr/sandy-springs-man-sentenced-tricare-and-medicare-fraud-scheme

payment of about $300, while the two recruiters got a commission for every prescription they brought in – amounting to over $1 million for one and over a quarter million for the other.[5]

Here the Greens admitted to their roles in billing hundreds of millions of dollars, and receiving tens of millions, from TRICARE and Medicare. The United States submits that a significant custodial sentence would be appropriate and not disparate with sentences imposed on similarly-situated coconspirators guilty of similar or the same fraudulent conduct.

## IV

## RESTITUTION

### A. GOVERNMENT HEALTH CARE PROGRAMS

The Financial Addendum for each defendant provides as follows:

> Accordingly, the parties will jointly recommend that [Defendants] pay restitution, joint and several … in the amount of **$74,415,909.69**. Any restitution judgment imposed for restitution to be paid to TRICARE in this case shall be credited by an amount equal to the amount of restitution payments made to TRICARE by co-conspirators Anthony Mauzy, Thomas Sahs, Rajesh Mawbubani, Senthil Ramamurthy, Mangala Ramamurthy, John Scholtes, Asif Uddin, Jennifer John Carbon, and John Frohrip, in case numbers l8-cr-20710-ALTONA, l8-cr-20546-GAYLES, 18-cr-20690-UNGARO (S.D. Fla.), 19-cr-122-CVE (N.D. Okla.), and Brett Sabado in case number 21-cr-00226-TWT (N.D. Ga.).

The restitution agreed to was divided between the two government payors targeted in the Greens' crimes of conviction. Parties agreed that restitution shall be paid to or on behalf of the following victims: TRICARE in the amount of $4,500,000 and Medicare in the amount of $69,915,906.69.

As to amounts paid to TRICARE by the listed coconspirators, based on Judgment and Commitment documents, the following restitution has been ordered as to defendants

---

[5] https://www.justice.gov/usao-sdca/pr/two-former-us-marines-and-nurse-practitioner-sentenced-65-million-tricare-fraud

15

Mauzy, Scholtes, Sahs, the Ramamurthys, Mahbubani, Carbon, and Uddin: a total of **$9,436,176**, joint and several.  *See* l8-cr-20710-ALTONA, Dkt. Nos. 354, 399, 400, 401, 407.

### B. CLAIM BY PRIVATE INSURER

In addition, the ILWU-PMA Welfare Plan has submitted a Victim Impact Statement requesting restitution from the Greens.  According to its submission, the ILWU-PMA Welfare Plan is an employee welfare benefit plan established and maintained jointly by the International Longshore and Warehouse Union (ILWU) and the Pacific Maritime Association (PMA).  In its submission, the ILWU-PMA Welfare plan contends that it was a victim of the same compounded medication fraud scheme by the Greens that the Greens carried out against TRICARE – in other words, that ILWU-PMA beneficiaries were recruited to receive medically unnecessary and expensive compounded medications, pharmacies dispensed those medications then submitted fraudulent bills to the Plan, then the pharmacies paid the Greens' companies kickbacks.  The Plan alleges that between August 2015 and September 2016, the Greens defrauded the Plan of more than $43 million, through the submission of more than 3,000 claims for prescription compounded drugs.[6]

The Greens oppose ILWU-PMA's request for restitution.  Due to the volume and complexity of the Plan's submissions, the parties request that the Court set a restitution hearing within 90 days, pursuant to 18 USC § 3664(d)(5), on May 24, 2024.

### C. FORFEITURE

On April 29, 2022, Amended Orders of Criminal Forfeiture were entered as to each of the Greens.  Dkt. Nos. 97, 98.  The Court ordered the Greens to forfeit currency seized from certain bank accounts, a 2018 Porsche Panamera, a 2019 Ford Lariat F-150, a 2019 Audi, the real property at 2936 Midsummer Drive in Windermere, Florida, and $3,921,057.29 in U.S. currency in lieu of real property at 1943 Idaho Avenue, in

---

[6]  The ILWU-PMA Plan's victim impact statement has been provided to US Probation and defense counsel, and will be filed under separate cover.

Escondido, California.  The Court also affirmed a money judgment imposed upon each of the Greens in the amount of $69,915,909.69.

The United States requests that the Court incorporate the forfeiture order into its pronouncement of judgment at sentencing.

# V
# CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court impose a sentence of 41 months as to Ron Green, 27 months as to Melinda Green, confirm the amended orders of forfeiture, and set a restitution hearing.

DATED: February 23, 2024          Respectfully submitted,

                                  TARA K. MCGRATH
                                  United States Attorney


                                  /s/ Valerie H. Chu
                                  VALERIE H. CHU
                                  Assistant U.S. Attorney